STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24 CV- 050336 - 590

SALLAMONDRA ROBINSON,                    )
INDIVIDUALLY AND AS                      )
PERSONAL REPRESENTATIVE OF               )
THE ESTATE OF SHANQUELLA ROBINSON,       )
DECEASED.                                )
                                         )
    *Plaintiff*,

v.                                       )          **<u>VERIFIED AMENDED</u>**
                                                    **<u>COMPLAINT</u>**
                                         )          <u>(JURY TRIAL DEMANDED)</u>

E'MANI GREEN,                            )
ALYSSE HYATT,                            )
MALIK DYER,                              )
WENTER DONOVAN,                          )
KHALIL COOKE,                            )
NAZEER TYREE WIGGINS,                    )
UNITED STATES DEPARTMENT OF              )
STATE, AND THE                           )
FEDERAL BUREAU OF INVESTIGATION,         )
                                         )
    *Defendants*.

## NATURE OF THE ACTION

    **COMES NOW**, Plaintiff Sallamondra Robinson, individually and as personal representative of the Estate of Shanquella Robinson, deceased, by and through undersigned counsel, complaining of the actions and inactions of E'Mani Green formerly known as Daejhanae Jackson, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, Nazeer Tyree Wiggins, the United States Department of State, and the Federal Bureau of Investigation states as follows:

## JURISDICTION, VENUE, AND APPLICABLE LAW

1. Venue is proper in this county, pursuant to N.C. Gen. Stat. 1-77.
2. Jurisdiction is proper pursuant to N.C. Gen. Stat. 1-82.

## NOTICE OF CLAIM

3. Plaintiffs presented timely Notices of Tort Claims, pursuant to the FTCA, 28 U.S.C. §§ 2671, et seq.; 2401; 2675(a) and all applicable federal regulations, giving notice of the

negligence caused by the acts or omissions of the United States Department of State and the Federal Bureau of Investigation, while acting within the scope of their scope of employment with the United States of America, under circumstances in which the United States, if a private person, would be liable to the Plaintiff, in accordance with the laws of the state of North Carolina.

## PARTIES

4. Sallamondra Robinson**,** Plaintiff, individually and as the Personal Representative of the Estate of Shanquella Robinson, is a resident and citizen of Mecklenburg County, North Carolina, and the Estate of Shanquella Robinson is presently open and pending before the Clerk of Superior Court in Mecklenburg County Case File No.: 2024 E 2019 590.

5. Defendant E'mani Green formerly known as Daejhanae Jackson is being sued in her individual capacity. Upon information and belief, she is a resident and citizen of Guilford County, North Carolina, with a personal address: 3023 Sherrill Avenue, Jamestown, North Carolina.

6. Defendant Alysse Hyatt is being sued in her individual capacity. Upon information and belief, she is a resident and citizen of Forsyth County, North Carolina, with a personal address: 412 Meshire Court, Winston-Salem, North Carolina.

7. Defendant Malik Dyer is being sued in his individual capacity. Upon information and belief, he is a resident  and citizen of Davidson County, North Carolina, with a personal address: 63 Hamil Street, Lexington, North Carolina.

8. Defendant Wenter Donovan is being sued in her individual capacity. Upon information and belief, she is a resident and citizen of Person County, North Carolina, with a personal address: 1550 Rumstone Lane, Charlotte, North Carolina .

9. Defendant Khalil Cooke is being sued in his individual capacity. Upon information and belief, he is a resident and citizen of Mecklenburg County, North Carolina, with a personal address: 3514 Charterhall Lane, Charlotte, North Carolina.

10. Defendant Nazeer Tyree Wiggins is being sued in his individual capacity. Upon information and belief, he is a resident and citizen of Mecklenburg County, North Carolina, with a personal address: 5521 Londonderry Road, Charlotte, North Carolina.

11. Defendant United States Department of State is a cabinet-level executive agency of the United States of America. The agency's mailing address is 2201 C. Street NW, Washington, D.C. 20520.

12. Defendant Federal Bureau of Investigation is a federal law enforcement agency of the United States of America. The agency's mailing address is 935 Pennsylvania Ave., NW, Washington, D.C 20535-0001.

## FACTUAL ALLEGATIONS

### The Murder in Mexico

13. Shanquella Robinson was a vibrant and driven 25-year-old, who had already established herself as a remarkable entrepreneur and a beloved community member.

14. As a proud college graduate, she pursued her degree with dedication and passion, embodying the spirit of hard work and perseverance.

15. In addition to her business endeavors, she had a special talent for braiding hair, particularly for children. This skill allowed her to build strong relationships with families in her community, because she offered a service that brought confidence and joy to young clients.

16. Her gentle demeanor and creativity made her a favorite among kids and parents.

17. Before her entrepreneurial journey, Shanquella was also a cheerleader, known for her infectious enthusiasm and dedication to her team.

18. Her spirited nature and leadership skills were evident in every aspect of her life, inspiring those around her to strive for the best.

19. Tragically her life was cut short, leaving a profound impact on her community and loved ones.

20. She is remembered not only for her accomplishments and excitement for travel but also her kindness, positivity, and the light she brought to the lives of so many.

21. Defendants, E'mani Green formerly known as Daejhanae Jackson, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Tyree Wiggins, (hereinafter referred to as "Cabo Six Defendants") were believed to be friends of the decedent, Shanquella Robinson.

22. Khalil Cooke, knowing Shanquella the longest and best, invited her to join the Cabo Six Defendants on what was supposed to be a fun and safe luxury vacation in Cabo San Lucas, Mexico in October of 2022.

23. Shanquella was invited to attend the trip to Mexico at the last minute, because other guests declined or otherwise canceled their plans to join.

24. When she arrived at the Puerto Los Cabos Villa Linda in Mexico on or about October 28, 2022, Shanquella spoke with her mother, Sallamondra Robinson. Neither Shanquella nor her mother knew that this call would be their last conversation.

25. On or about October 29, 2022, the rest of the Cabo Six Defendants arrived at the villa in Cabo San Lucas, as evidenced by the Cabovillas.com Private Villa and Condominium Guest Register, attached as **(Exhibit A)** and fully incorporated by reference herein.

26. On or about October  29, 2022, Defendant E'mani brutally attacked Shanquella Robinson, in one of the bedrooms at the villa.

27. Defendant E'Mani repeatedly punched Shanquella in the face, head, neck, and other parts of her body.

28. During the attack, Shanquella was naked, completely exposed, and unable to respond or defend herself.

29. Still, Defendant E'mani tossed Shanquella around the room, in the presence of the other Cabo Six Defendants.

30. Not one of the other Cabo Six Defendants intervened to assist Shanquella while Defendant E'mani's violent and relentless attack persisted.

31. Not one of the Cabo Six Defendants attempted to contact local law enforcement during the attack.
32. Instead, the members of the Cabo Six Defendants reveled at the spectacle and recorded the incident that would be shared later on social media.
33. Multiple members of the Cabo Six Defendants can be seen watching the brutal attack with phones out and heard yelling at Shanquella, not Defendant E'Mani.
34. The attack continued for several minutes.
35. Upon information and belief, Defendant Wenter facetimed Defendant E'Mani's boyfriend so he could watch the attack.
36. Upon information and belief, Defendant E'Mani's boyfriend cheered her on as she continued to strike Shanquella.
37. Upon information and belief, there was nothing Shanquella could have done to warrant this fatal attack.
38. No one tried to console or help Shanquella with her severe and apparently painful injuries.
39. When members of the Cabo Six Defendants finally called the villa concierge, hours later, they requested medical personnel to get Shanquella hydrated and implied that she needed to be treated for alcohol poisoning.
40. Shanquella was not verbally responsive and was lethargic prior to the doctor arriving upon the scene.
41. Defendant Khalil contacted Sallamondra Robinson advising that Shanquella had alcohol poisoning and that the Cabo Six Defendants were going to put her in the shower.
42. When the doctor arrived, Shanquella was unable to advocate for her own medical treatment or advise the doctor that she had been beaten because her injuries rendered her unable to speak.
43. None of the Cabo Six Defendants told the doctor that Shanquella was the victim of blunt force to the head and neck.
44. None of the Cabo Six Defendants provided any information to the doctor about the brutal attack.
45. The Cabo Six Defendants continuously told the doctor that Shanquella was sick from drinking too much alcohol and did not need to be transported to the local hospital for immediate medical attention.
46. After taking Shanquella's vitals, it became clear to the doctor that Shanquella needed more than hydration.
47. The doctor implored the Cabo Six Defendants to authorize Shanquella's immediate transportation to the hospital and notified her supervisor when the Cabo Six Defendants indicated they would not provide authorization. Attached as **(Exhibit B)** and fully incorporated by reference herein is the physician's interview report.
48. Her vital signs were dangerously abnormal.

49. The Cabo Six Defendants denied Shanquella this life-saving treatment by refusing to authorize transportation for her.

50. The Cabo Six Defendants insisted that Shanquella only be treated with fluids for "alcohol poisoning".

51. The doctor repeatedly requested authorization from the Cabo Six Defendants to transport Shanquella via ambulance to the hospital, because her vital signs were weakening. Furthermore, the doctor provided information about local public hospitals that could treat Shanquella at no cost. The Cabo Six Defendants refused. *See* **Exhibit B.**

52. Defendant Khalil called Sallomandra Robinson and told her that Shanquella needed medical treatment for dehydration. Defendant Khalil requested Shanquella's social security number, insurance information, and $5,000 USD.

53. Sallamondra Robinson provided the social security number and advised that everything else would be in her purse.

54. Defendant Khalil never told Sallamondra Robinson that Shanquella was dying, was violently attacked by Defendant E'Mani, or otherwise unsafe. Instead, Defendant Khalil insisted that Shanquella was merely dehydrated and needed an IV.

55. At all times during the final moments of Shanquella's life, Sallamondra Robinson was unable to communicate directly with villa staff, local law enforcement, or medical personnel, to get the truth of her daughter's condition.

56. The doctor requested help from the Cabo Six Defendants, so that she could attempt resuscitation.

57. Defendant Malik remained in the room while all of the other members of the Cabo Six Defendants left.

58. When Shanquella no longer had a pulse, the doctor called 911 to notify law enforcement that emergency services were needed.

59. Three emergency medical service providers arrived at the villa, including the Mexican Red Cross.

60. All three ambulance agencies confirmed that Shanquella could not be transported to the hospital at this point because she no longer had any measurable vital signs.

61. Shanquella was pronounced dead at the villa, in the presence of medical personnel and all of the Cabo Six Defendants, on October 29, 2022.

62. According to the autopsy report, Shanquella Robinson's cause of death was a spinal cord injury and atlas luxation. Attached as (**Exhibit C**) and fully incorporated by reference herein is an excerpt of the autopsy report.

63. Police officers arrived to prepare the necessary paperwork and take Shanquella's body to the morgue.

64. During his interview with law enforcement, Defendant Khalil claimed Shanquella got the bruises on her head and arms from a fall in the pool. At no point during this interview did he inform law enforcement of Defendant E'Mani's violent attack on Shanquella.

Furthermore, Defendant Khalil never told the doctor or any responding physicians that Shanquella fell in the pool.

65. Shortly after law enforcement arrived at the villa, the Cabo Six Defendants packed their belongings and requested transportation to get dinner.

66. Defendant E'mani and Defendant Khalil took Shanquella's belongings and suitcase with them when they exited the villa.

67. Neither Defendant E'mani nor any of the other Cabo Six Defendants checked out of the villa.

68. Once in the vehicle, the Cabo Six Defendants told the driver to take them to a hotel near to the airport.

69. The Cabo Six Defendants returned to the United States the next morning, a full day ahead of schedule, without disclosing the attack or the injuries sustained by Shanquella to the Mexican authorities.

70. When the Cabo Six Defendants arrived in North Carolina, each of the Defendants worked in concert to conceal information about the facts and circumstances of Shanquella's death from her family and law enforcement.

71. Defendant E'Mani and Defendant Khalil came to Sallamondra Robinson's home, and returned Shanquella's suitcase. In Sallamondra Robinson's home, while she was grieving the immeasurable loss of her child, Defendant E'Mani and Defendant Khalil offered their condolences for Shanquella passing from "alcohol poisoning."

72. Sallamondra Robinson became ill, and experienced and exhibited symptoms of sleeplessness, anxiety, depression and other forms of severe mental distress, as a result of learning of her daughter's untimely death.

## The Viral Video

73. The disturbing video footage depicting the Defendant E'Mani beating Ms. Robinson was released on or about November 15, 2022 to circulate the Internet. Still images of the viral video are attached as **(Exhibit D)** and fully incorporated by reference herein.

74. Weeks after Shanquella's death, Cabo Six Defendants continued to perpetuate the lie that alcohol poisoning was Shanquella's cause of death.

75. The Cabo Six Defendants did not warn or advise Sallamondra Robinson that footage of Ms. Shanquella Robinson being brutally attacked in the last moments of her life was circulating the web.

76. Upon watching the gruesome footage, Sallamondra Robinson experienced renewed anxiety, depression and other forms of severe mental distress.

77. Sallamondra Robinson's trauma was exacerbated as family members, friends, and strangers discovered the video. Further, media outlets played the video repeatedly on television and on social media platforms.

78. Sallamondra Robinson continues to suffer from mental distress as a result of Defendants' wrongful actions and the inescapable exposure to the triggering footage.

**Denied Records Request**

79. The FBI informs Sallamondra Robinson that it opened an investigation into the murder of Shanquella Robinson in November 2022.

80. In April of 2023, the FBI advised Sallamondra Robinson, her family, and the public that no enforcement proceedings would commence and the agency would not be pursuing a federal prosecution of any of the Cabo Six Defendants.

81. An initial records request seeking nonexempt "FBI records from 10/29/2022 - 08/1/2023 related to Shanquella Robinson" was mailed in compliance with the Freedom of Information Act on August 31, 2023, four months after the federal agents stated the conclusion of their investigation into Shanquella's death.

82. On September 28, 2023, the FBI responded to this request, identifying responsive records and assigning the FOIA Request # 1602946-00.

83. The FBI advised that these records were exempted from disclosure under 5 U.S.C. § 552 (b)(7)(A) "expected to interfere with enforcement proceedings" and this records request was administratively closed.

84. Despite formally closing the case, the FBI refused to return Shanquella's property or provide additional details of their investigation.

85. A year after the federal agents publicly announced the discontinuation of their investigation of Ms. Shanquella Robinson's unlawful death overseas, a renewed records request was made May 10, 2024.

86. The FBI responded on June 6, 2024. The agency did not, however, confirm or deny the existence of responsive records.

87. Furthermore, the FBI's June 6th response did not indicate whether the request was being processed, when documents were expected to be released, whether any exemptions applied to the requested documents, or whether the responsive records would be posted to the FBI's electronic FOIA Library (The Vault).

88. The only indication that responsive records may have been identified was the Request # 1602946-00, which was identical to the 2023 request.

89. In an email received on June 13, 2024, the FBI constructively denied the renewed request by stating the estimated date of completion would be some time within **2,010 days, over 5 years.**

90. In an attempt to justify this unreasonable delay of over five years, the FBI characterized the request as "complex".

91. According to the agency, "requests are processed in the order in which they are received through [the] multitrack processing system". According to the FBI, complex requests are requests having "over 40 pages of potentially responsive documents." These requests are then assigned to the large track if the potentially responsive pages are between "501-4,999 pages."

92. The agency aims to further extend this amorphous timeline, by claiming, "The search for responsive records is ongoing for [the] request, so we do not yet know into which track it will fall."

93. The FBI claims it will take over five years to produce previously identified documents related to an investigation that took the agency six months to close.

94. An appeal of this constructive denial was submitted on behalf of Sallamondra Robinson, and denied.

## CAUSES OF ACTION
### A. COUNT I: WRONGFUL DEATH (E'MANI GREEN)

95. Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 94 as if they were fully set forth herein.

96. Defendant E'mani viciously attacked Shanquella Robinson, causing her fatal injuries.

97. Undoubtedly, Shanquella suffered excruciating personal injury, pain and suffering prior to her death. Had Decedent survived, she would have been entitled to bring an action against Defendant E'mani for damages.

98. Pursuant to N.C. Gen. Stat. § 28A-18-2, those persons being identified as beneficiaries include Sallamondra Robinson, who has suffered the following damages and is entitled to compensation:
   a. Compensation for pain and suffering for the Decedent;
   b. Compensation for the loss of the reasonably expected:
      i. Net income of the decedent;
      ii. Services, protection, care and assistance of the Decedent;
      iii. Society, companionship, comfort, guidance, kindly offices and advice of the decedent to the persons entitled to the damages recovered;
   c. Compensation for the expense of:
      i. transporting Ms. Robinson's body from Mexico,
      ii. funeral and burial expenses

99. Plaintiff, Sallamondra Robinson, as the personal representative of the Estate of Shanquella Robinson has suffered damages, in excess of $25,000 as a result of the wrongful death caused by Defendant E'mani Green.

### B. COUNT II: SIMPLE BATTERY (E'MANI GREEN)

100. Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 99 as if they were fully set forth herein.

101. Defendant E'mani intentionally and repeatedly punched, kicked, and hit Shanquella Robinson.

102. Shanquella Robinson did not consent to this offensive physical contact at any point during the altercation. As seen on the video, Shanquella Robinson was unresponsive as Defendant E'mani violently punched, hit, and tossed her across the room. Neither her nudity nor her apparent physical lethargy deterred Defendant E'Mani from continuing her attack.

103. Defendant E'mani's offensive contact directly caused Shanquella Robinson's fatal injuries.

104.    Plaintiff, Sallamondra Robinson, as the personal representative of the Estate of Shanquella Robinson has suffered damages, in excess of $25,000 as a result of the battery caused by Defendant E'mani.

## C. COUNT III: NEGLIGENCE (CABO SIX DEFENDANTS)

105.    Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 104 as if they were fully set forth herein.

106.    Defendants E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, And Nazeer Tyree Wiggins ("Cabo Six Defendants") owed Shanquella Robinson a duty of reasonable care.

107.    Each of the Cabo Six Defendants breached their duty by lying to medical staff in Mexico and failing to disclose critical, potentially life-saving information.

108.    Alternatively, each of the Cabo Six Defendants breached their duty to Shanquella Robinson by refusing to authorize imperative medical transportation.

109.    The Cabo Six Defendants' failure to disclose critical information directly and proximately caused Shanquella Robinson's wrongful death. At all times material, medical staff in Mexico was unaware of the blunt force to Shanquella Robinsons' head and neck, and was precluded from assessing these injuries and acting promptly to save her life.

110.    Shanquella Robinson died, in part, because each of the Cabo Six Defendants impeded the life-saving treatment she needed.

111.    Plaintiff, Sallamondra Robinson, as the personal representative of the Estate of Shanquella Robinson has suffered damages in excess of $25,000 as a result of the actions and inaction of each of the Cabo Six Defendants, E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins.

## D. COUNT IV: CIVIL CONSPIRACY (CABO SIX DEFENDANTS)

112.    Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 111 as if they were fully set forth herein.

113.    Defendants E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, And Nazeer Tyree Wiggins ("Cabo Six Defendants") agreed to conceal and destroy evidence connected to Shanquella Robinson's death.

114.    The Cabo Six Defendants knowingly concealed critical information from medical staff and law enforcement in Mexico in order to evade culpability for Shanquella's death and return to the United States.

115.    Each of the Cabo Six Defendants conspired to impede all investigation into the wrongful death of Shanquella Robinson, in the United States and Mexico, because any investigation would reveal their criminal and civil wrongdoing, including but not limited to Defendant E'mani's battery and the Cabo Six Defendants' negligence.

116.    Upon information and belief, Cabo Six Defendants tampered with evidence at the crime scene, including but not limited to, rummaging Shanquella Robinson's purse and luggage.

117.  As planned, the Cabo Six Defendants' scheme to conceal and destroy evidence did not conclude once they departed from Mexico. Upon information and belief, the parties agreed to continue to conceal information and evidence related to Shanquella Robinson's death from law enforcement in the United States.

118.  Upon information and belief, when they arrived in the United States, each of the Cabo Six Defendants discussed how autopsy results, especially Shanquella's neck injuries, would criminally implicate them.

119.  Bound to the conspiracy agreement, members of the Cabo Six provided false information to and omitted critical information from Shanquella's family.

120.  Plaintiff, Sallamondra Robinson, individually and as the personal representative of the Estate of Shanquella Robinson has suffered damages in excess of $25,000 as a result of the actions and inaction of each of the Cabo Six Defendants, E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins.

## E.  COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (CABO SIX DEFENDANTS)

121.  Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 120 as if they were fully set forth herein.

122.  The Cabo Six Defendants knowingly released a video depicting Defendant E'mani viciously attacking Shanquella Robinson, while she was naked, unarmed, and defenseless.

123.  Shanquella Robinson's intimate body parts were fully exposed in the room of Cabo Six Defendants, and on the footage being disseminated on the Internet without her consent.

124.  Members of the Cabo Six Defendants posted this explicit video on social media, knowing Shanquella's loved ones would be severely, psychologically impacted by watching, without warning. the gruesome violence that ended her life.

125.  The Cabo Six Defendants intentionally posted this video to further expose and embarrass Shanquella and her family, including her mother, Sallamondra Robinson.

126.  None of the Cabo Six Defendants warned Sallamondra Robinson that this video would be released on the Internet.

127.  It is highly foreseeable that posting this triggering video of the violent attack of Shanquella Robinson, her last moments alive, would cause Sallamondra Robinson severe emotional distress.

128.  The gruesome video not only reached the community of North Carolina residents connected to the Cabo Six Defendants, but also went viral, spreading at lightning speed across the Internet.

129.  Sallamondra Robinson, in fact, suffered severe emotional distress, including but not limited to severe depression, sleeping disorders, and anxiety from the inescapable posting

and reporting of this footage. While grieving her child, Sallamondra Robinson was subjected to view Shanquella callously and brutally beaten to death.

130.  Plaintiff, Sallamondra Robinson, individually and as the personal representative of the Estate of Shanquella Robinson has suffered damages in excess of $25,000 as a result of the intentional actions and inaction of each of the Cabo Six Defendants, E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins.

### F. COUNT VI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (CABO SIX DEFENDANTS)

131.  Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 130 as if they were fully set forth herein.

132.  The Cabo Six Defendants owed Sallamondra Robinson a duty to use ordinary care.

133.  The Cabo Six Defendants knowingly disclosed and circulated a video depicting Defendant E'mani viciously attacking Shanquella Robinson.

134.  The explicit and violent video was posted on the social media platform, accessible to millions of users.

135.  At all times material hereto, it was foreseeable that the rampant circulation of this violent and explicit video would cause Sallamondra Robinson severe emotional distress.

136.  Once the video went viral on the Internet, it was foreseeable that Sallamondra Robinson would not only have a visceral reaction to the last moments of her daughter's life, but also that such repetitive exposure would cause severe emotional distress.

137.  Sallamondra Robinson, in fact suffered severe emotional distress, including but not limited to severe depression, sleeping disorders, and anxiety, as a direct and proximate result of each of the Cabo Six Defendants' actions and inaction.

138.  Alternatively, each of the Cabo Six Defendants owed a duty to use ordinary care in seeking medical care for Shanquella Robinson.

139.  Each of the Cabo Six Defendants breached that duty by withholding critical life-saving information from medical staff in Mexico.

140.  Sallamondra Robinson suffered severe emotional distress as a direct and proximate result of each of the Cabo Six Defendants' negligence, including their inaction which caused Shanquella Robinson's wrongful death. Sallamondra Robinson suffered severe emotional distress,  a foreseeable result of this negligence.

141.  Plaintiff, Sallamondra Robinson, individually and as the personal representative of the Estate of Shanquella Robinson has suffered damages in excess of $25,000 as a result of the actions and inaction of each of the Cabo Six Defendants', E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins, negligent actions and inaction.

## G. COUNT VII: NEGLIGENCE (DEPARTMENT OF STATE)

142.   Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 141 as if they were fully set forth herein.

143.   Sallamondra Robinson, as the administratrix of Shanquella Robinson's estate, brings this claim under the Federal Torts Claim Act, 28 U.S.C. §§ 1346 and 2671-80.

144.   For more than 160 years, the United States and Mexico have maintained an extradition relationship.

145.   At the conclusion of the murder investigation conducted by the Mexican authorities, upon information and belief, an extradition request was submitted to the Department of State for Defendant E'mani.

146.   Notwithstanding the extradition request, upon information and belief, the Department of State failed to forward the request for extradition to the Criminal Division's Office of International Affairs, as required.

147.   This failure to submit the extradition request has permitted international fugitive Defendant E'mani to avoid facing legal proceedings for the murder she committed in Cabo San Lucas, Mexico.

148.   As a result of the United States Department of State's inaction and undue delay, Plaintiff, Sallamondra Robinson, individually and as the personal representative of the Estate of Shanquella Robinson has suffered damages in excess of $25,000.

## H. COUNT VIII: NEGLIGENCE (FEDERAL BUREAU OF INVESTIGATION)

149.   Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 148 as if they were fully set forth herein.

150.   Sallamondra Robinson, as the administratrix of Shanquella Robinson's estate, brings this claim under the Federal Torts Claim Act, 28 U.S.C. §§ 1346 and 2671-80.

151.   The Federal Bureau of Investigation has the authority and the nondiscretionary duty to investigate murders of American citizens that occur overseas.

152.   The FBI advised Sallamondra Robinson that an investigation into the death of her daughter, Shanquella Robinson commenced.

153.   This investigation was closed a few months later.

154.   As the mother of the deceased, the FBI owed Sallamondra Robinson a duty to thoroughly investigate the death of Shanquella Robinson, maintain her personal property in good condition, and to inform Sallamondra Robinson of the status of the investigation.

155.   The FBI breached this duty by failing to respond to this investigation with the appropriate seriousness and urgency. Their unreasonable delay to investigate and mishandling of evidence led to the erosion and destruction of evidence.

156.   If the FBI had complied with its duties and statute to investigate, critical evidence would have been preserved.

157. Due to the FBI's delay, the quality of the second autopsy completed by United States authorities was compromised, as Shanquella's body had been altered by embalming chemicals, decomposition, and the effects of being subjected to a full autopsy by Mexican authorities.

158. At all times material hereto, the FBI was aware that the members of the Cabo Six were persons of interest in the murder of Shanquella Robinson.

159. The Mexican authorities have maintained that Shanquella Robinson was killed by the dislocation of vertebrae in her neck, caused by the barrage of punches from Defendant E'mani.

160. The FBI's incomplete investigation directly and proximately caused the damages suffered by Sallamondra Robinson and the Estate of Shanquella Robinson. Notably, the FBI's inaction has impeded Sallamondra Robinson and her family's ability to receive closure and justice from the criminal prosecution of Shanquella Robinson's murderer.

161. As a result of the inaction and undue delay in investigating the murder of Shanquella Robinson, Plaintiff, Sallamondra Robinson, individually and as the personal representative of the Estate of Shanquella Robinson has suffered damages in excess of $25,000.

## I. COUNT IX: 5 U.S.C FAILURE TO PROMPTLY RELEASE RECORDS (FEDERAL BUREAU OF INVESTIGATION)

162. Plaintiff realleges and incorporates by reference all allegations and statements in Paragraphs 1- 161 as if they were fully set forth herein.

163. Defendant Federal Bureau of Investigation is an agency subject to and within the meaning of the Freedom of Information Act, (hereinafter "FOIA").

164. Plaintiff Sallamondra Robinson, by and through Counsel, submitted FOIA Requests requesting records within the possession, custody, and control of the Federal Bureau of Investigation.

165. The Federal Bureau of Investigation is obligated under 5 U.S.C. § 552(a)(3)(A-D) and (a)(8)(A)(b) to produce records responsive to Plaintiff's FOIA Requests.

166. As represented in The Federal Bureau of Investigation's response, the agency has in its possession responsive, non-exempt documents, including those specifically identified in Plaintiff's requests, that they have failed to produce.

167. Defendant Federal Bureau of Investigation's withholding of nonexempt records violates the FOIA.

**WHEREFORE**, Plaintiff requests that this Court order Defendant to:
   a. immediately process and release any and all responsive records;
   b. enjoin Defendant from withholding non-exempt responsive documents;
   c. award Plaintiff its costs and reasonable attorneys' fees;
   d. and grant other relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, for their causes of action, pray this Honorable Court for relief as follows:

a. The entry of judgment against E'mani Green in favor of the Plaintiff for Count I wrongful death in an amount of $2,000,000.00;

b. The entry of judgment against E'mani Green in favor of the Plaintiff for Count II battery in an amount of $2,000,000.00;

c. The entry of judgment against each of the Cabo Six Defendants (E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins) in favor of the Plaintiff for Count III negligence in an amount of $400,000.00 per defendant;

d. The entry of judgment against each of the Cabo Six Defendants (E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins) in favor of the Plaintiff for Count IV civil conspiracy in an amount of $400,000.00 per defendant;

e. The entry of judgment against each of the Cabo Six Defendants (E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins) in favor of the Plaintiff for Count V intentional infliction of emotional distress in an amount of $400,000.00 per defendant; ;

f. The entry of judgment against each of the Cabo Six Defendants (E'mani Green, Alysse Hyatt, Malik Dyer, Wenter Donovan, Khalil Cooke, and Nazeer Wiggins) in favor of the Plaintiff for Count VI negligent infliction of emotional distress in an amount of $400,000.00 per defendant;

g. The entry of judgment against the United States Department of State in favor of the Plaintiff for Count VII negligence in an amount in excess of $25,000;

h. The entry of judgment against the Federal Bureau of Investigation in favor of the Plaintiff for Count VIII negligence in an amount in excess of $25,000;

i. Injunctive relief from the Federal Bureau of Investigation;

j. An order compelling the immediate release of responsive records from the Federal Bureau of Investigation;

k. Award compensatory damages to the Plaintiff and against the Defendants;

l. Award punitive damages to the Plaintiff against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

m. Award Plaintiff their costs and reasonable attorneys' fees;

n. That all triable issues of fact be determined by a jury; and

o. For such other and further relief, the Court deems just and equitable under law.

Respectfully submitted this 6th day of November, 2024.

**FRONTLINE FIRM**
/s/ Sue-Ann Robinson
Sue-Ann Robinson, Esq.
FBN: 29463
614 S. Federal Highway
Fort Lauderdale, FL 33301
T: 754-801-0897
sueann@frontlinefirm.com

*Pro hac vice forthcoming*

/s/ Gabrielle Higgins
Gabrielle Higgins, Esq.
FBN: 1025840
614 S. Federal Highway
Fort Lauderdale, FL 33301
T: 754-801-0897
gabrielle@frontlinefirm.com
*Pro hac vice forthcoming*

**WALLIS, BOWENS, AVERHART & ASSOCIATES, PLLC**
/s/ Saleisha Nadia Averhart
Saleisha Nadia Averhart, Esq. (NC State Bar No. 40178)
5500 McNeely Drive, Ste. 102
Raleigh, North Carolina 27612
T: 919-741-6798
saleisha@wbaalaw.com

# EXHIBIT A


**CABOVILLAS.com**

1.800.745.2226 • Fax 831.768.1191 • 567 Auto Center Drive, Watsonville, CA 95076 • www.cabovillas.com

## Private Villa and Condominium Guest Register - Terms and Conditions & Assumption of Risk

We, the undersigned, agree to all the terms and conditions as set forth on page 2 & page 3 of this document for the subject property stated herein. We have been afforded the opportunity to review said Agreement. Parents/Guardians understand that they are signing on behalf of the minors in their care and/or custody. All signatories should be mindful of the fact that there are risks associated with travel and activities incidental to travel and are invited to re- read the language which relate to the assumption of risk in the body of the Agreement.

Property Name: __LINDA 32__   Invoice #: __101130__   Date: __10/28/22 - 10/31/22__

| | Print Name | Signature | Cell Phone Number |
|---|---|---|---|
| 1) | | | |
| 2) | Khalil Cooke | Khalil Cooke | (704) 315-1714 |
| 3) | Malik Dyer | | 860·790·9964 |
| 4) | Wenter Donovan | | |
| 5) | Shanquella Robinson | | 704-456-5010 |
| 6) | Alysse Hyatt | | 336-517-6371 |
| 7) | Daejhanae Jackson | | 860-888-9370 |
| 8) | Nanser Wiggins | | |
| 9) | | | |
| 10) | | | |
| 11) | | | |
| 12) | | | |
| 13) | | | |
| 14) | | | |
| 15) | | | |
| 16) | | | |
| 17) | | | |
| 18) | | | |
| 19) | | | |
| 20) | | | |
| 21) | | | |
| 22) | | | |
| 23) | | | |
| 24) | | | |
| 25) | | | |
| 26) | | | |
| 27) | | | |
| 28) | | | |
| 29) | | | |
| 30) | | | |
| 31) | | | |
| 32) | | | |

# EXHIBIT B

[Official seal]

[Official seal]
PGJE
Baja California State Attorney
General's Office

| Reference No. |
| --- |
| SJC/3063/2022 |

**INTERVIEW REPORT**

| Body/Institution: | PGJE | | |
| --- | --- | --- | --- |
| State | Baja California Sur | | |
| City, municipality, delegation, locality: | San Jose del Cabo | | |
| | Day | Month | Year |
| Date | 16 | November | 2022 |
| Time | 14:00 hours | | |

| Legal Basis: Article 21, Paragraph 1 of the Political Constitution of the United Mexican States, Article 132, Section X of the National Code of Criminal Procedure. | | |
| --- | --- | --- |
| Witness ☒ | Injured Party ☐ | Victim ☒ |

| INFORMATION ABOUT THE INTERVIEWER | | | |
| --- | --- | --- | --- |
| Name: | Suni Jehseel Popoca Millán | Title: | **AEIC** |
| Assignment | [Illegible] | | |
| Place of interview | Av. Paseo de la Marina 4113 Col. El Medano CP 23453, Cabo San Lucas, AMC Hospital | | |

| INFORMATION ABOUT THE INTERVIEWED PARTY | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Name: | Karolina Beatriz Ornelas Gutierrez | | | Age: | 29 | |
| DOB | 07/05/1993 | Gender: | M ☐ | F ☒ | Civil status: | Single |
| Place of birth: | Ensenada | | | | Nationality | Mexican |
| Profession or trade: | General Doctor | | | | Language: | Spanish B2 - English |
| Education: | Bachelor | | | | Native of | Baja California |
| Address: | Av. Paseo de la Marina 4113 Col. El Medano CP 23453, Cabo San Lucas, AMC Hospital | | | | | |
| Tattoos, birthmarks, visible marks | No | | | | Aliases: | No |
| Telephone: | 33 32 01 30 89 | | | | | |
| ID: | INE Voter Code ORGTKR93050702M300 | | | | | |

[Official seal]

## Interview Transcript

This is my statement given to investigation agent Suni Jehseel Popoca Millán in relation to the facts

that are investigated by the Attorney General's Office of the state of Baja California Sur. On October

29 of the year 2022 when I was at my place of work in the AMC hospital which means American

Medical Center in Cabo San Lucas in the municipality of Los Cabos, where I work as a general

practitioner, at 14:13 hours approximately I was informed by WhatsApp message that medical

assistance had been requested for a person in Puerto Los Cabos in San Jose del Cabo, at Villa Linda

Puerto Fundadores number 32. The reason for the medical assistance was that the person had

consumed a lot of alcohol and they wanted to hydrate her. I arrived at the aforementioned address

by means of a hospital vehicle at approximately 15:15 hours, where I was able to see six individuals,

including Miss Shanquella. I was received by a male person of dark complexion, slim build, English

speaking, approximately 25 years old, as well as by a female

---

| [Illegible signature] | Suni Jehseel |
| --- | --- |
| | Popoca Millán   [Illegible signature] |
| Karolina Beatriz Ornelos Gutierrez | AEIC |
| | PGJE |
| **Name and signature of the interviewed party** | **Name and grade of the police officer** |

[Official seal]

| Interview Transcript |
| --- |

of dark complexion, of regular build, dressed in blue, approximately 26 years old; further back there was a tall African-American person of stocky build, with a bulging cap on his head, approximately 28 years old. These people pointed out to me a dark-skinned female of African-American descent, of slim build, approximately 25 years old, sitting on the couch with her head resting on the top edge of the couch and the rest of her body resting on the couch, covered with a light blanket from the chest down and wearing a blouse (I don't remember the details of it) and purple leggings. Her eyes were open, she was disheveled, dehydrated, her lips were dry, she did not articulate words, only sounds. She had a blow to the forehead on the right side, no deformities were felt in the skull, she had poor response to light. I proceeded to call her name, which was provided seconds before by her companions, I touched her shoulder, I put myself at her height visually without obtaining any response from the person, so I suggested that she needed to be taken to the hospital

| [Illegible signature] | Suni Jehseel |
| --- | --- |
| Karolina Beatriz Ornelos Gutierrez | Popoca Millán  [Illegible signature] |
| | AEIC |
| | PGJE |
| Name and signature of the interviewed party | Name and grade of the police officer |



[Official seal]

[Official seal]
PGJE
Baja California State
Attorney General's Office

## Interview Transcript

I proceeded to take vital signs, temperature of 36.1 °C, heart rate of 66, respiratory rate of 17, pulse saturation by oximeter of 98% and blood pressure of 98/60. She also had a right conjunctival hemorrhage. I auscultated her heart and lungs, no abnormal sounds were heard. I noticed that her nails were painted and her capillary filling was delayed, which confirms that she was dehydrated. I informed her companions that she was dehydrated but that she did need to be evaluated at the hospital; I asked if there was a history of drug use, illnesses, allergies, all denied; I asked how much alcohol she had consumed and what she had consumed. The answer was "countless and of all kinds"; this answer was given to me by the female person, who will be named as person number 1 and is thin and tall, with very long hair; and a second female person of robust build, tall, dark complexion, who will be identified as number 2, who told me that Miss Shanquella had drunk a lot. I asked everyone how they were related to her (Shanquella).

---

[Illegible signature]

Karolina Beatriz Ornelos Gutierrez

**Name and signature of the interviewed party**

Suni Jehseel
Popoca Millán    [Illegible signature]
AEIC
PGJE

**Name and grade of the police officer**



[Official seal]

[Official seal]
PGJE
Baja California State
Attorney General's Office

## Interview Transcript

and I was told that they are all friends from college. To help me with Shanquella's assessment, the

male identified as number 1, of slim build, dark complexion, about 25 years old, wearing a cap, and

the female named Wenter (I know her name because the emergency call was made from her number

and it was necessary to provide her name) stayed with me. The girl number 2 and Wenter requested

that Shanquella be seen at that address and the other girl identified as number 1 said that she had

been like this before and that she used to get better with hydration. I insisted that it was better for

her friend to be taken care of at the hospital and that I can proceed to start hydration but that she

will require assessment and care at the hospital and continue her care there and immediately; that

they needed to notify a family member to find out if they would be in charge, since there were no

direct family members, to which they are reluctant. Wenter and the girl No. 2 told me that they had

the means to pay me but they did not have the money to pay an expensive hospital bill.

| [Illegible signature] | Suni Jehseel |
| Karolina Beatriz Ornelos Gutierrez | Popoca Millán    [Illegible signature] |
| | AEIC |
| | PGJE |
| Name and signature of the interviewed party | Name and grade of the police officer |



[Official seal]

[Official seal]
PGJE
Baja California State
Attorney General's Office

## Interview Transcript

I did not want to receive any kind of remuneration. Taking into account that it was going to be necessary to cover the cost of the materials, either on site or outside, I insisted on taking her to the hospital; I informed them that there were public hospitals that had no cost, and told them to ask the family members if she (Shanquella) had any type of insurance, and told them to start making the calls, because she had to be treated in a hospital. The one who stayed to assist me was the male identified with number 1, who helped me to hold her hand to try to place an IV. While they were deliberating what to do, I know that the female identified as number 2 and Wenter called someone, reporting Shanquella's condition, and the need to make decisions, they insisted during the call that Shanquella was only dehydrated and only needed an IV and that I was insisting on taking her to a hospital, but that they had no money. In turn, I called my boss, Dr. Alvaro Atilano, who confirmed that if I felt it was necessary to take her to a hospital, to emphasize to her friends the need to take her to a hospital.

| [Illegible signature] | Suni Jehseel |
| Karolina Beatriz Ornelos Gutierrez | Popoca Millán   [Illegible signature] |
|  | AEIC |
|  | PGJE |
| **Name and signature of the interviewed party** | **Name and grade of the police officer** |



[Official seal]

[Official seal]
PGJE
Baja California State
Attorney General's Office

| Interview Transcript |
| --- |

and that I must not move her under any circumstance if they do not accept; and that in case they do not reach a decision, that I should leave the place. I then informed them that I could not place the IV because she is dehydrated and does not speak well. Their new response was that they did not have a car to take her in, to which I told them to call 911 or to look for a way to take her there; they replied that all that costs money. They ask me which hospital they could take her to and I tell them the nearest public hospital or the closest hospital. They deliberate again and I tell them that I am going to leave. They tell me that they were already checking with her relatives to see if she had insurance and ask me to try to place the IV one last time. For the third time I tried to place an IV in her left arm and I succeeded, but when I tried to secure the IV, she began to have generalized tonic-clonic convulsions. At that moment the person identified as female number 1, Wenter, and the male identified as number 1 were present. During the convulsions the IV came out, I compressed her hand, they got scared and I told them not to move her;

| [Illegible signature] | Suni Jehseel |
| Karolina Beatriz Ornelos Gutierrez | Popoca Millán   [Illegible signature] |
| | AEIC |
| | PGJE |
| **Name and signature of the interviewed party** | **Name and grade of the police officer** |

[Official seal]

[Official seal]
PGJE
Baja California State
Attorney General's Office

## Interview Transcript

I told them not to put anything in her mouth and that now they really needed to call 911. Then

Wenter told me to do it myself, to which I told her that she needed to make the call because I had to

take care of Shanquella. Then I realized her sphincter had relaxed. At that moment the male identified

as number 1 told me that she had peed already; this changed my perspective and reinforced the need

for a complete evaluation in a complete imaging study with urgent hospital attention and transfer by

ambulance. After a few minutes and when Shanquella stopped convulsing, I realized her companions

were gone; only male number 1 and Wenter had stayed with me. I then proceed to monitor her vital

signs as much as I could; I request support to position her airway and verify that 911 is being called.

Wenter called and passed me her phone; I report a female in post-ictal state, requested an urgent

unit; I notice that abnormal sounds are heard in her breathing (rales) and it is difficult to open the

airway due to trismus; her saturation was low.

---

[Illegible signature]

Karolina Beatriz Ornelos Gutierrez

**Name and signature of the interviewed party**

Suni Jehseel
Popoca Millán    [Illegible signature]
AEIC
PGJE

**Name and grade of the police officer**

[Official seal]

[Official seal]
PGJE
Baja California State
Attorney General's Office

## Interview Transcript

By this time about an hour had elapsed. Patient with pulse, increased respiratory effort. Help is requested from the only friend left within my reach, who is the male identified as number 1, to look for a hard plastic tube to keep her mouth open. He asks me to transfer Shanquella in my vehicle, to which I tell him that she is in serious condition and requires an ambulance. He then left and I was left alone with her and I try to position the airway, take a pulse; at 16:49 she is detected without pulse, verbally I shouted to them "she no longer has a pulse, I need help". The thin girl identified as number 1 looks out, panics and leaves; male number 1 helps me lower her to the floor next to the couch and place her in a flat position. I called 911, indicate this was as a follow up to the previous report, that the patient is now in arrest; CPR maneuver is initiated, with me giving compressions and his friend helping me with rescue ventilation, until the Red Cross ambulance arrived, about five minutes after she went into arrest. I asked them to transfer the patient by ambulance, but they refused saying that they cannot take her without a pulse; the same thing that the other three ambulances that came to the scene told me. One of the paramedics managed to place an IV

[Illegible signature]

Karolina Beatriz Ornelos Gutierrez

Name and signature of the interviewed party

Suni Jehseel
Popoca Millán   [Illegible signature]
AEIC
PGJE

Name and grade of the police officer

[Official seal]

[Official seal]
PGJE
Baja California State
Attorney General's Office

## Interview Transcript

then the other three responder teams joined in. The AED device is placed and they were advised not to discharge. Immediately a [illegible] cannula is placed and ventilation with bag mask; I am informed that there is a laryngeal mask but it cannot be placed because there is still trismus. I insist on transferring the patient. Five ampoules of adrenaline were applied in 2 resuscitation efforts. Until they accepted my advice and they were told via monitor to discharge, and defibrillation was performed 6 times. The monitor was placed with an asystolic trace and her friends were informed that there was no response. After approximately one hour of maneuvers, I informed one of her friends, identified as male number 2, of regular build, dark complexion, bald, bearded, who asked me why they did not take her to a hospital, to which I replied that no paramedic accepted to transfer her to a hospital in her condition. He was shaking and left the scene. The paramedics informed me that there was no longer any motor response and that the monitor was in asystolic and that there was no adrenaline left and that in that condition they were not going to transfer her; another attempt at reanimation was made, no pulse was detected in asystolic without any type of motor response with dilated pupils, without pupillary or corneal response, so she was declared deceased at 17:57 hours. At the end of the third round of maneuvers, the municipal police officers had already arrived at the scene and did not interfere in any way, only in one of the relays that were made, they asked me about the patient's condition, to which I responded that she needed to be transferred to the hospital, letting the medics work. After she was declared deceased, I waited for them to finish interviewing one of the Red Cross paramedics, as he was one of the first to arrive in the ambulance. One of the officers took my statement and about 10 minutes before the end of the interview Giovanni the administrator arrived and the officers told me that I could not leave yet; I stayed there for about 15 more minutes, and I left the place around 19:30 hours.

## Remarks

| [Illegible signature] | Suni Jehseel |
| | Popoca Millán   [Illegible signature] |
| Karolina Beatriz Ornelos Gutierrez | AEIC/ PGJE |
| Name and signature of the interviewed party | Name and grade of the police officer |

# EXHIBIT C

# NECROPSY

[Official seal]
PGJE
State of Baja California Sur
Attorney General's Office
**Government of the State of Baja California Sur**
**State Attorney General's Office**
**Specialized Unit for the Investigation and**
**Prosecution of Miscellaneous Offenses**

[Rubber-stamped seal]
RECEIVED
[Illegible]

[Handwritten]
Received
1/5/22
[Illegible signature]

San Jose del Cabo, B.C.S., December 19, 2022

**Order No.: UEIDD/719/2022**
**NUC SJC/3063/2022**
**Re: Additional Report**

District Attorney Agent of the Lower Court
Assigned to the Specialized Unit for the Investigation and
Prosecution of Miscellaneous Offenses

By hand

I hereby report this about NUC: SJC/3063/2022, started for the crime of **FEMICIDE** to the detriment of **SHANQUELLA BRENADA ROBINSON**, against an unknown defendant:

On December 8, 2022 this investigative unit received a response on order 642/2022 from the group's chief **Juan Pablo Sepulveda**, assigned to this investigative unit by **CHRISTIAN ARMENDARIZ**, GENERAL MANAGER OF THE HOTEL AEROPUERTO LOS CABOS, annexed herein.

On December 8 order 703/2022 was sent to the person in charge of the C2 Bureau of the Control and Monitoring of the Bureau of Public Security, Municipal Traffic and Preventive Police of the H. XIV Los Cabos Town Hall, Baja California Sur, **annexed herein**.

A response to order DGSPPPYTM/C2/280/2022 was received from **LIEUTENANT COMMANDER AARON BAUTISTA ALVAREZ,** in charge of the C2 Bureau of the Control and Monitoring of the Bureau of Public Security, Municipal Traffic and Preventive Police of the H. XIV Los Cabos Town Hall, Baja California Sur, **annexed herein**.

Order 704/2022 was sent to the General Director of the Control Center, Communication and Computation Command of the Baja California Sur State **BRUNO KHMER CANTARELL MAYTORENA** by email direccion4loscabos@hotmail.com, c4bcs@hotmail.com, order annexed herein.

A response was received on December 12, 2022 by email from **BRUNO KHMER CANTARELL MAYTORENA**, General Director of the Control Center, Communication and Computation Command (C4), **annexed herein**.

On December 14, 2022 **RODOLFO PALOMERA JIMENEZ** was interviewed and the record is annexed herein.

**Government of the State of Baja California Sur**
**State Attorney General's Office**
**Specialized Unit for the Investigation and**
**Prosecution of Miscellaneous Offenses**

The aforesaid is based on the first paragraph of Article 21 of the Constitution of the United Mexican States, as related to Article 132 Section VII of the National Penal Procedures Code, and Section V of Article 46 of the organic law of the Prosecutor's Office of the Baja California Sur State

Sincerely,

[Rubber-stamped seal]
[Illegible]

[Illegible signature]
Lic. Suni Jehsee Popoca Millan
Criminal Investigation State Agent
Assigned to the Specialized Unit for the Investigation and
Prosecution of Miscellaneous Offenses

DIRECTORATE OF FORENSIC SERVICES
DEPARTMENT OF LEGAL AND FORENSIC MEDICINE
RE: NECROPSY REPORT
Page: SJC222048
File: UEIDD/559/2022
NUC: SJC/3063/2022

San Jose del Cabo, Baja California Sur, October 30, 2022

Lic. Suni Jeseel Popoca Millan
Criminal investigation agent assigned to the Specialized Unit for
the Investigation and Prosecution of Miscellaneous Offenses
By hand:

The undersigned, attorney Rene Adalberto Galvan Oseguera, expert forensic doctor of Baja California Sur District Attorney's Office, ID number: 632734 and SSA registry 79278, assigned to the Forensic Services Bureau, named to intervene in SJC/3063/2022, page assignment: 222048 and MF 1319 per official letter: UEIDD/559/2022, of October 30, 2022, issues this:

**REPORT:**

**ISSUE.**

*"Examine and identify a cadaver, determine causes of death of whom, when alive, was named **ROBINSON SHANQUELLA BRENADA**, female, apparently 25 years old, determine approximate time of death, make a detailed description of the external and internal injuries, as well as the other objectives of the necropsy, following internationally accepted protocols."*

**MATERIAL**

Surgical table, saw, scalpel, thumb forceps, measuring tape, camera.

**METHOD**

The analytical and deductive medical forensic scientific methodology will be used in this intervention. Techniques used: Virchow, Rokitansky, mixed, photographing and video during the procedure. Techniques used: Mixed (x) Photographs: Yes Sampling: Yes

**DESCRIPTION:**

**Forensic legal or medical examination and necropsy:**

The cadaver was received packaged in a white plastic bag, duly labeled and preserved, with a chain of custody registry. Brought at 20:30 hours to the autopsy table at the Medical Forensic Service on October 29, of this year. Later, at 09:00 hours on October 30, 2022, we gathered at the autopsy table at the Medical Forensic Service to examine, identify and perform a necropsy on the cadaver of whom was called in life: **ROBINSON SHANQUELLA BRENADA.**

**PHYSICAL DESCRIPTION:**

Age: 25 years. Sex: Female. Skin Color: Black. Anthropometry: Stature: 165 cm. Approximate weight: 65 kilograms. Build: Regular. Hair color: Black. Type: Curly. Size: Short. Hair insertion: High. Face shape: Oval. Size: Broad medium forehead. Type: Rounded. Size: Medium. Forehead type: Oval. Size: Small. Hair insertion: Medium. Eyebrow type: Scarce tattooed. Type: Thick. Size: Medium. Color: Dark. Proximity: Separate. Direction: Horizontal. Eye type: Oval. Size: Medium. Color: Coffee. Nose type: Broad. Size: Large. Point: Rounded. Side: Convex. Base: Broad. Nares type: Large.

B401MF-F0-001      Rev. 0    Page 1 of 4
Palo Verde e/Palo de Arco, Col. Viva las Veredas C.P. 23425 San Jose del Cabo, Baja California Sur
Tel. (624) 10-49450      Email: periciales@pgjebcs.gob.mx

| [Official seal] | GOVERNMENT OF THE STATE OF BAJA CALIFORNIA SUR<br>STATE ATTORNEY GENERAL'S OFFICE | [Official seal]<br>PGJE<br>State of Baja California Sur<br>Attorney General's Office |
| --- | --- | --- |

DIRECTORATE OF FORENSIC SERVICES
DEPARTMENT OF LEGAL AND FORENSIC MEDICINE
RE: NECROPSY REPORT
Page: SJC222048
File: UEIDD/559/2022
NUC: SJC/3063/2022

Size: Large. Lips: Thick. Corners: Horizontal. Denture: Complete, dental work: Malformations: No. Ear type: Oval. Size: Small. Lobes: Unattached.

## DESCRIPTION OF SPECIAL PECULIARITIES

Scars: No

Tattoos: Yes in right anatomic snuffbox, a heart shaped figure of 3 by 3 centimeters, in the dorsal region and left shoulder to the lumbar region is a female face and flowers of 45 centimeters.

Characteristics birthmarks or nevus: No

## DESCRIPTION OF POSTMORTEM SIGNS

Postmortem

Lividity: Yes. Located at: Posterior regions. Disappear when pressed: Yes. Rigor mortis: Yes. Located at: Reducible. Cadaveric spam: No. Dehydration: Yes. Corneas with black spots: No. Lower body temperature: Yes 20 degrees centigrade.

**Transformational Signs**

Putrefaction: No. Discoloration period: No. Emphysematous: No. Colliquative: No. Skeletal reduction: No. Mummification: No. Maceration: No. Saponification: No. Cadaverous entomofauna: No.

**Description of External Injuries**

Direct contusion in the frontal region in the median part of 8 X 4 cm. with hematoma.

Direct contusion in the left illiac crest with a hematoma 7 X 3 cm., the injury happened more than 12 hours before death.

Contusion in the right illiac crest with a hematoma 4 X 8 cm., the injury happened more than 12 hours before death.

Contusion in the left hand's anatomic snuffbox with a two cm. Hematoma.

In the left big toe, a one cm. skin excoriation.

Anterior thorax in xiphoid shows signs of defibrillator burns in a 6 X 5 cm. area, and this is the only one with postmortem characteristics.

The right eyeball has sclerotic internal hemorrhagic zone of .5 cm.

Sampling: Yes. Cavities: Vaginal, anal. Nail scraping. Others: Blood sample for study, packed and given to the Forensic Chemical Lab through chain of custody.

Postmortem fingerprinting: Yes.

## EXTERNAL EXAMINATION OF THE CADAVER

Clothing: Tank top black (Jockey brand, size L), purple shorts without size (Love University brand), no underwear, without shoes.

Venoclysis in the right extremity.

Anterior thorax in xiphoid shows signs of defibrillator burns in a 6 X 5 cm. area, and this is the only one with postmortem characteristics.

These injuries can be seen before taking the clothes off.

B401MF-F0-001                                    Rev. 0      Page 2 of 4
Palo Verde e/Palo de Arco, Col. Viva las Veredas C.P. 23425 San Jose del Cabo, Baja California Sur
Tel. (624) 10-49450                                Email: periciales@pgjebcs.gob.mx

| [Official seal] | GOVERNMENT OF THE STATE OF BAJA CALIFORNIA SUR<br>STATE ATTORNEY GENERAL'S OFFICE | [Official seal]<br>PGJE<br>State of Baja California Sur<br>Attorney General's Office |
| --- | --- | --- |

DIRECTORATE OF FORENSIC SERVICES
DEPARTMENT OF LEGAL AND FORENSIC MEDICINE
RE: NECROPSY REPORT
Page: SJC222048
File: UEIDD/559/2022
NUC: SJC/3063/2022

**INTERNAL EXAMINATION, OPENING OF CAVITIES**

The cavities were opened with the mixed technique and this was found:

Head: The frontal region of the scalp and muscles show a 12 cm. hematoma.

Skull: No info.

1. Cranial cavity: No info.

Brain weight: 1,200 grams. Brain matter: Edematous, slightly congestive. Cortex: No relevant info. Central nervous system: Ventricles: Edematous, hemorrhages. Cerebellum: Edematous. Brain stem: Edematous. Medulla oblongata: Normal.

Neck: The left lateral neck shows a 7 X 2 cm. infiltrate, with atlas and medullary dislocation.

Thorax

1. Lungs: Congestive, basal edematous hemorrhagic.

Cardiovascular system: Heart: No info. Pericardium: No info.

Abdomen: No info. Digestive system: No info. Esophagus: No info. Stomach: No alterations. Liver: Size: Normal. Color: Red. Gall bladder: Size: 10 cm. Consistency: Normal. Color: Greenish. Pancreas: Size: 16 cm. Consistency: Normal. Spleen: 12 cm. Intestines: Small: No info. Large intestine: No info. Genitourinary system: No info. Right kidney: No info. Left kidney: No info.

Pelvis: Bladder: No info.

Upper extremities: A two cm. contusion in the anatomic snuffbox. Lower extremities: In the left big toe, a one cm. skin excoriation. Backbone: No info. Osteomuscular system: No info. Genitalia: No info. There is a 20 cm. area from the vulval region down to each thigh.

Photography: Yes. Video: No. Evidence taken: Yes. What type: Organic. Samples taken: Yes. Blood sample for clinical test.

The evidence or samples found were sent to:

Chemistry, toxicology, evidence room.

[Rubber-stamped seal]
[Illegible]

**NOTES, COMMENTS AND SPECIAL ANALYSIS:**

We can say that the autopsy findings:

1) Toxicology report: Waiting for chemistry lab results.

**BIBLIOGRAPHICAL NOTES**: Quiroz Cuaron, Forensic Medicine.
**INDIVIDUALIZATION FINDINGS** External: No     Internal: No

B401MF-F0-001                                           Rev. 0     Page 3 of 4
Palo Verde e/Palo de Arco, Col. Viva las Veredas C.P. 23425 San Jose del Cabo, Baja California Sur
Tel. (624) 10-49450                                    Email: periciales@pgjebcs.gob.mx

DIRECTORATE OF FORENSIC SERVICES
DEPARTMENT OF LEGAL AND FORENSIC MEDICINE
RE: NECROPSY REPORT
Page: SJC222048
File: UEIDD/559/2022
NUC: SJC/3063/2022

## CONCLUSIONS

We can say, based on the aforesaid and the findings, that:
The cause(s) of death of whom in life was called: **ROBINSON SHANQUELLA BRENADA**

*1. WAS: ATLAS AND MEDULLARY DISLOCATION.*
**2. Type or manner of death: Violent.**
3. Pre-existing pathology: Unknown.
4. **Time of death**: Between 17-20 hours when the necropsy was performed.
5. **Signs of survival**: Yes. The cadaver shows signs of torture: No.
6. Determination if the injuries are post-mortem: No, we found defibrillator injuries consistent with resuscitation efforts this injury is in the xiphoid appendix.
7. End of the necropsy: 11:00 hours
8. The cadaver was identified: Yes.

[Rubber-stamped seal]
[Illegible]

Sincerely
[Illegible signature]
Dr. Rene Adalberto Galvan Oseguera
Expert Medical Examiner
SSA: 632734 DGP 79278

[Rubber-stamped seal]
[Illegible]

Death certificate: Yes **220057239**
Delivery of death certificate: Yes
Attachments: Set of photos.

B401MF-F0-001                    Rev. 0      Page 4 of 4
Palo Verde e/Palo de Arco, Col. Viva las Veredas C.P. 23425 San Jose del Cabo, Baja California Sur
Tel. (624) 10-49450                    Email: periciales@pgjebcs.gob.mx

[Official seal]
PGJE
State of Baja California Sur
Attorney General's Office

**GOVERNMENT OF THE STATE OF BAJA CALIFORNIA SUR**
**STATE ATTORNEY GENERAL'S OFFICE**
**BUREAU OF FORENSIC SERVICES**
**FIELD FORENSICS**

**Delivery-Receipt of Evidence**

| Reference No. |
|---|
| SJC/3063/2022/NUC |

| Page or Claim | Delivery-Receipt Place | Time and Date of Delivery-Receipt |
|---|---|---|
| SJC 22 | SEMEFO[1] San Jose del Cabo | 10/29/2022 |
| 2046 | | 20:50 hours |
| | | |
| | | |

1. Inventory (Write the number, letter of alphanumeric combination identifying each delivered piece of evidence, as well as its type or class. Cancel the remaining spaces.)

| Identification | Type or Class |
|---|---|
| A | Body of the individual named Robinson Shanquella Brenda when alive. |
| | |
| | |
| | [Rubber-stamped seal] |
| | [Illegible] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

2. Packaging. (Note the conditions of the packaging. When any show alteration, deterioration or any other anomaly, specify it.)

| |
|---|
| |
| |
| |
| |

| Delivery Person |
|---|
| Lic. Eduardo Trinidad Juarez |
| PGJE Criminal Expert |
| [Illegible signature] |
| Full Name, institution, position and signature |

| Receiver |
|---|
| [Illegible] |
| |
| |
| Full Name, institution, position and signature |

Annexed delivery-receipt continuation: Yes ☐ No ☐

---

[1] Servicio Médico Forense, Forensic Medical Service

[Official seal]
PGJE
State of Baja California Sur
Attorney General's Office

**GOVERNMENT OF THE STATE OF BAJA CALIFORNIA SUR**
**STATE ATTORNEY GENERAL'S OFFICE**
**BUREAU OF FORENSIC SERVICES**
**FIELD FORENSICS**

**Delivery-Receipt of Evidence**

| Reference No. |
| --- |
| SJC/3063/2022 |

| Page or Claim | Delivery-Receipt Place | Time and Date of Delivery-Receipt |
| --- | --- | --- |
| SJC 22 | Evidence room San Jose del Cabo Colonia Las Veredas | Oct 30, [Illegible] |
| 2046 | | 11:31 hours |
| | | |
| | | |

1. Inventory (Write the number, letter of alphanumeric combination identifying each delivered piece of evidence, as well as its type or class. Cancel the remaining spaces.)

| Identification | Type or Class |
| --- | --- |
| 01 | 1 brown handbag with two books, a notebook, a hygiene kit, a red bag with one $50 bill, five $20 bills, one $10 bill, nine $1 bills, one black key, a driver's license under the name Robinson Shanquella Brenada, two passports. |
| 02 | One white cellphone [Rubber-stamped seal] [Illegible] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

2. Packaging. (Note the conditions of the packaging. When any show alteration, deterioration or any other anomaly, specify it.)

| Evidence received without knowledge of the contents. | | |
| --- | --- | --- |
| | [Rubber-stamped seal] RECEIVED Oct 30, 2022 [Illegible] | |

| Delivery Person |
| --- |
| Lic. Eduardo Trinidad Juarez |
| PGJE Criminal Expert |
| [Illegible signature] |
| |
| Full Name, institution, position and signature |

| Receiver |
| --- |
| [Illegible signature] |
| Karen Andrea Castro [Illegible] |
| Evidence Room Assistant |
| |
| Full Name, institution, position and signature |

Annexed delivery-receipt continuation: Yes ☐ No ☒

# EXHIBIT D







## VERIFICATION

STATE OF _____ NC _____

Mecklenburg _____ COUNTY

I, Sallamondra Robinson, am the Plaintiff in the above referenced matter, depose and sayeth that I authorized to make this verification, that I have read the foregoing Complaint and know the contents thereof, that the same is true of my personal knowledge, except to those matters therein alleged upon information and belief, and as to those matters, I believe them to be true.

This the _6_ day of November, 2024

_Sallamondra Robinson_
Sallamondra Robinson, Plaintiff

I, _Zachary Craig_ , a Notary Public for said county and state do hereby certify that Sallamondra Robinson, personally appeared before me and being by me duly sworn, stated that she executed the foregoing Verification Page to the Complaint, that she has personal knowledge of the facts contained within, except for those which are upon information and belief, and for those she believes such statement to be true, and that she believes each fact to be true and correct to the best of her knowledge.

Witness my hand and official seal, this the _6_ day of November, 2024.

_____
Signature of Notary Public

_Zachary Craig_
Printed Name of Notary Public

My Commission Expires: _12/1/28_____